**In re Anonymous Nos. 30 D.B. 75 & 57 D.B. 75**

Disciplinary Board Docket nos. 30 D.B. 75 and 57 D.B. 75.

HARRINGTON, *Board Member*, February 25, 1977—Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania (board) herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF THE PROCEEDINGS

At the above numbers, two separate petitions for discipline were filed by the office of disciplinary counsel naming [respondent] as respondent therein. In due course the matters were assigned to hearing committee [ ], comprised of [ ], Esq., chairman, and [ ], Esq., and [ ], Esq., members. The petition for discipline docketed at no. 57 D.B. 75, involving the estate of [A] was heard on January 4, 1976. The testimony relating to the petition for discipline filed at no. 30 D.B. 75, involving [B] and the estate of her deceased husband [C], was taken by the committee on Friday, April 30, 1976. All hearings were held at the office of the Disciplinary Board at [ ], Pa. At all hearings, [ ], Esq., represented petitioner and respondent represented himself. A substantial number of stipulations were entered into, exhibits were examined and received into evidence. Witnesses were called on behalf of petitioner and respondent testified in his own behalf.

After the testimony was closed, the hearing committee reported in its conclusions of law that respondent had violated the following Disciplinary Rules:

a. D.R. 6-101(A)(3)—dealing with neglect by an attorney of a legal matter entrusted to him;

b. D.R. 7-101(A)(1)—dealing with failure to seek the lawful objectives of a client;

c. D.R. 7-101(A)(2)—dealing with failure to carry out a contract of employment;

d. D.R. 7-101(A)(3)—dealing with causing prejudice or damage to a client during the course of the professional relationship;

e. E.C. 6-4—dealing with safeguarding the interests of the client after accepting employment;

f. E.C. 6-5—dealing with having pride in professional endeavors;

g. E.C. 7-1—dealing with the duty to represent the client zealously;

h. E.C. 7-9—dealing with acting in a manner consistent with the best interests of the client.

In its report, the hearing committee discussed each case individually but made its ultimate disposition of the cases as a unit. The ultimate disposition of the cases recommended by the hearing committee was a private reprimand for respondent before the Disciplinary Board. The board adopted the findings and conclusions of the hearing committee and at the same time rejected the recommendation for discipline of private reprimand before the Disciplinary Board as proposed by the hearing committee and in its place recommends to your honorable court that respondent, [ ], be administered public censure by the Supreme Court.

## II. FINDINGS AND DISCUSSION

Respondent [ ], was born in [ ], Pennsylvania on [ ], 1935. He is married and is the father of four

children. He presently resides at [ ], Pa. [Respondent] was graduated from [ ] College in [ ] and from the University of [ ] Law School in 19[ ]. He has been associated with his present firm in [ ], Pa. since 19[ ].

## [B & C] MATTER

[C] and his wife [B] were residents of [ ] in [ ] County. [C] was a retired baggage handler for the railroad company and he and his wife lived modestly on the monthly pension he received. On September 30, 1962, [C] and his wife were passengers in an automobile being operated in [ ] County, when the automobile was involved in an accident. Both [B & C] sustained some injuries but those sustained by [C] were so severe as to result in his death on October 8, 1962. On June 12, 1963, respondent suggested to [B] certain terms of employment which were accepted by her and respondent became the attorney representing [B] in her own behalf and as a person entitled to share the estate of her deceased husband in the matter of the claim for damages. For several months thereafter, respondent pursued the matters relating to the claim. He wrote to [ ] Casualty Company and to [ ] Insurance Company advising them that he represented the estate of [C] and [B] in their claim for damages. He wrote letters to the hospital requesting information and letters to the client instructing her in various ways concerning her responsibilities and directing her in her dealings with creditors of the estate.

On October 7, 1963, respondent caused an action to be commenced in the Court of Common Pleas of [ ] County at No. [ ] in trespass by filing "Summons in Trespass," in which [B], individually, and

as administratrix of the estate of [C], deceased, was plaintiff and [D] was defendant. This caption possesses some curious aspects since the correspondence between [B] and respondent clearly states that the letters of administration were not granted until September 23, 1964, nearly a year after suit had been filed. On October 4, 1965, the writ was reissued and served. No complaint was ever filed, however, and on November 23, 1965, respondent was ruled to file a complaint. No complaint was filed, however. On April 29, 1966, again respondent was served with rule to file a complaint. No complaint was filed, however. On August 30, 1966, a judgment of non pros was entered for failure to file a complaint.

From the information available it appears that the letter of September 29, 1964 from respondent to his client was the last time that there was any communication between them. In 1968 [B] went to Judge [E] and asked for assistance from the Judge in getting information from respondent concerning the status of her case. Judge [E] sent [B] to [F], an attorney in [  ] County, Pa. As a courtesy to the judge and as a favor to [B], attorney [F] wrote a letter to respondent on July 9, 1968, in which he requested a status report on the case. That was the first of 16 letters written by attorney [F] to respondent and to not one of those 16 letters did Mr. [F] ever receive a reply. The letters ranged from businesslike inquiries "Will you please be so kind as to let me know the status of the case?" letter of July 9, 1968 from [F] to respondent; to supplicatory "[B] is very upset and disturbed about this matter and I hope and trust that you will give it your immediate attention and conclude same without delay." letter

July 30, 1969 from [F] to [respondent]; to annoyance "I am greatly annoyed of the latest development regarding. . . ."

In addition to the letters, Mr. [F] made telephone calls on behalf of [B]. At the hearing Mr. [F] testified that he attempted to reach respondent by telephone on seven or eight occasions. On no occasion was he successful in speaking with respondent except on February 4, 1969. On that date on the occasion of the telephone conversation between the two, respondent informed Mr. [F] that he had, in fact, received an offer to settle the [B & C] cases in the amount of $6,000. Within a few days Mr. [F] wrote a letter to respondent advising respondent that [B] was willing to accept the offer of $6,000. In fact, there had been no offer of $6,000. In fact, the action had been dismissed for lack of prosecution, which fact had never been related by respondent to his client or to attorney [F]. Respondent had fabricated the story about the offer of settlement.

Sometime in 1973, [B] made a complaint to the disciplinary office. On April 23, 1973, assistant disciplinary counsel wrote a letter to respondent, asking for a reply to the complaints made against him by [B]. Respondent did not reply to the letter of the Disciplinary Board. A petition for discipline was filed on April 22, 1975. On August 29, 1975, [B] died and, of course, the hearing proceeded without her, on April 30, 1976.

At the hearing, [respondent] appeared on his own behalf and when he was called upon to proceed with his defense, respondent testified:

"Now, may it please the Board, this is another, I am afraid, very sad example of having let a client

down and it is made worse, I fear, by reason of the fact that, of course, there never was any offer of settlement from any carrier subsequent to the entry of a non pros. Once the non pros was entered in August of 1966, of course, the carrier involved would hardly be interested in any settlement.

". . . But the fact that . . . [B], were not promptly advised of the failure to file a complaint within twenty days of the Rule to do so and of the entry of non pros, as I say, I fear, makes the situation even worse.

"The record of some twenty letters or seventeen letters or whatever and numerous telephone calls is, again, I fear, literally indefensible, and all that I can really say is that at this late date we are trying to do what we can to make amends, bearing in mind and realizing that we cannot make amends, particularly in view of [B's] demise.

"I think there is very little else I can say."

The above contains almost all of the testimony of respondent and certainly the only explanation involved by way of a defense to the charges that he violated the Disciplinary Rules of the Code of Professional Responsibility set forth above.

Three days before the hearing on April 30, 1976, respondent for the first time in nearly 13 years after he had been entrusted with his clients' cause met with the daughter and son of C and B in the office of Attorney [F] in [ ] in an effort to bring the matter to a close. Respondent made the observation " . . . in connection with that meeting of minds certain actions have been taken on my part . . ." (N.T. April 30, 1976, p. 15.) The certain actions taken were unfortunately too late to serve the clients that he had been retained to represent. As a matter of fact, the action taken came nine and half years after his

clients cause had been non prossed and three years after he had been requested by the Disciplinary Board to respond to his clients' complaints against him.

## [A] ESTATE

The findings of fact filed by the hearing committee are adopted by the board and included in this report verbatim from the hearing committee report.

a. In July of 1967, [A] died in [　] County, Pa., leaving a will in which [G] was named executrix.

b. Mrs. [G] engaged [H], Esq., as attorney for the estate. Through the office of Attorney [H] the will was offered for probate but probate proceedings were never completed. About one week after the offer of the will for probate, Attorney [H] died and through her office, the estate was referred to respondent as attorney for the executrix.

c. Despite several requests from Mrs. [G] to respondent, respondent gave her no information as to the status of the estate, and, in fact, did nothing to assist in the administration of the estate.

d. In September of 1970, Mrs. [G] consulted [I] Esq., an attorney at law of the State of New Jersey, in which State Mrs. [G] resided, in an effort to ascertain the status of the [A] estate.

e. From the period September 10, 1970 to September 8, 1972, Mr. [I] wrote to respondent requesting status reports and received no replies to any of his letters.

f. As a result, in May of 1973, Mr. [I] referred to the matter by letter to Chief Justice Jones of the Pennsylvania Supreme Court. Thereafter, the petition for discipline was filed and served on respondent. Respondent did not file an answer to the petition for discipline.

g. Respondent testified in his own behalf and stated, inter alia, "this is a colossal case of completely dropping a ball and really, never really picking it up." Respondent further testified "there is no denial that I did not communicate. The question is to whether there was a duty to do so, I think I probably pretty clearly did have a duty to do so. I think these people have been remarkably patient and much more patient than they really have any right to be. So that, in a nutshell, I feel responsible for this, what I guess is a pretty unconscionable delay I simply have to pay the price for it."

h. In his testimony, respondent simply admitted his guilt and stated that there is no reasonable explanation for his actions in the matter.

In this matter as in many that come before this board, the issue is not whether the Code of Professional Responsibility has been violated by respondent. It has by his own admission. (Paragraph g. Hearing Committee Report, page 7, N.T. April 30, 1976 p. 22, 23) The only issue to be resolved by this board is the type of discipline it should recommend to your honorable court as the enforcing agency. As the Disciplinary Rules should be uniformly applied to all lawyers regardless of the nature of their professional activities, so should discipline be uniformly administered. "The severity of judgment against one found guilty of violating a Disciplinary Rule should be determined by the character of the offense and the attendant circumstances." Code of Professional Responsibility (Preliminary Statement).

In these matters, the "character of the offense" is patent. There has been unconscionable delay and mismanagement by respondent of his client's affairs to their detriment.

As to "attendant circumstances," there appear to be none to favor respondent. Mr. [ ], hearing committee chairman, attempted to elicit any favorable attendant circumstances when he asked respondent:

"Mr. [Chairman]: [Respondent], I notice in looking at the record in the [A] problem 30 D.B. 75 and the hearing today, that it was during a period of around 1968 on that you had the difficulty in both of these matters. Was there anything wrong with you physically or emotionally that would have caused you to delay both of these cases?

"Respondent: In frankness, Mr. [Chairman], and in response to the specific question on the questionnaire, I have not made any such claim and I make none now. . . ."
(N.T. April 30, 1976 p. 25, 26)

As respondent, himself, stated it was "a very sad example of having let a client down . . ." and ". . . there is really no rational explanation for letting a thing like this turn out the way it did . . ." (N.T. January 14, 1976, p. 82)

As part of its recommendation, the Hearing Committee did report:

"Subsequent to the hearings, by letter dated May 27, 1976, [F], Esq., attorney for the estate of the complainant, [B], [B] now being deceased, and attorney for the Estate of [C], deceased, informed [disciplinary counsel], Esq., that [respondent] had made full settlement of all matters which were the subject matter of the complaints. Respondent was extremely cooperative in fullfilling his commitment and the heirs of the complainants recommend leniency in disposing of the present action."

While it does not appear from the record exactly what was involved in the "full settlement" it is assumed that settlement refers to settlement with the heirs of the [B & C] estates on the basis of the value of the personal injury and wrongful death claim as well as compensation to the executrix and beneficiaries for any losses sustained by them in the [A] estate. The fact that restitution was made to those persons having suffered a loss as a result of respondent's conduct may very well be taken into account as a mitigating circumstance: Kraus's Case, 322 Pa. 362, 188 Atl. 737 (1936). Having taken that mitigating circumstance into account, it is again the opinion of the members of the full board that private discipline is inadequate and is inconsistent with the character of the offense and the attendant circumstances.

## RECOMMENDATION

This board recommends to your honorable court that respondent be administered public censure by the Supreme Court.

## ORDER

EAGEN, *C.J.*, And now, March 21, 1977, the report and recommendations of the Disciplinary Board of the Supreme Court of Pennsylvania dated February 25, 1977, are hereby approved, and it is ordered that [respondent] be subjected to public censure at the session of the Supreme Court commencing April 12, 1977, in [   ].